Robert C. Moest, Of Counsel, SBN 62166
**THE BROWN LAW FIRM, P.C.**
2530 Wilshire Boulevard, Second Floor
Santa Monica, California 90403
Telephone: (310) 915-6628
Facsimile: (310) 915-9897
Email: RMoest@aol.com

*Counsel for Plaintiff*

[Additional Counsel on Signature Page]

# UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| JOSEPH FLEISCHMAN, derivatively on behalf of DERMTECH, INC., <br><br> Plaintiff, <br><br> v. <br><br> JOHN DOBAK, KEVIN SUN, MARK CAPONE, CYNTHIA COLLINS, NATHALIE GERSCHTEIN KERAUDY, KIRK MALLOY, MATTHEW POSARD, MONICA TELLADO, ENRICO PICOZZA, and HERM ROSENMAN, <br><br> Defendants, <br><br> and <br><br> DERMTECH, INC., <br><br> Nominal Defendant. | Case No.: **'23 CV 2289 JAH BGS** <br><br><br> **JURY TRIAL DEMANDED** |

## VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

## **INTRODUCTION**

Plaintiff Joseph Fleischman ("Plaintiff"), by Plaintiff's undersigned attorneys, derivatively and on behalf of Nominal Defendant DermTech, Inc. ("DermTech" or the "Company"), files this Verified Shareholder Derivative Complaint against John Dobak ("Dobak"), Kevin Sun ("Sun"), Mark Capone ("Capone"), Cynthia Collins ("Collins"), Nathalie Gerschtein Keraudy ("Keraudy"), Kirk Malloy ("Malloy"), Matthew Posard ("Posard"), Monica Tellado ("Tellado"), Enrico Picozza ("Picozza"), and Herm Rosenman ("Rosenman") (collectively, the "Individual Defendants," and together with DermTech, the "Defendants") for breaches of their fiduciary duties as directors and/or officers of DermTech, unjust enrichment, gross mismanagement, abuse of control, and waste of corporate assets, violations of Section 14(a) of the Securities Exchange Act of 1934 (the "Exchange Act") and against Defendants Dobak and Sun for contribution under Sections 10(b) and 21D of the Exchange Act. As for Plaintiff's complaint against the Individual Defendants, Plaintiff alleges the following based upon personal knowledge as to Plaintiff and Plaintiff's own acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through Plaintiff's attorneys, which included, among other things, a review of the Defendants' public documents, conference calls and announcements made by Defendants, United States Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding DermTech, legal filings, news reports, securities analysts' reports and advisories about the Company, and information readily obtainable on the Internet. Plaintiff believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1.      This is a shareholder derivative action that seeks to remedy wrongdoing committed by DermTech's directors and officers from March 8, 2021 through November 3, 2022, both dates inclusive (the "Relevant Period").

2.      DermTech is a Delaware corporation based in San Diego, California that produces and distributes specialty pharmaceutical products.[1] The Company also offers medicines for early detection of skin cancer and inflammatory diseases. In particular, the Company offers the DermTech Melanoma Test ("DMT"), which is a commercial test that assesses pigmented skin lesions for melanoma.

3.      On August 8, 2022, the Company filed its Form 10-Q with the SEC for the quarterly period ended June 30, 2022 (the "2Q22 10-Q"), revealing that the Company expected "a lower average selling price (ASP) for [its] DMT [because of] … Medicare billing code edits [and] … less favorable collection patterns from commercial payors."

4.      On this news, the Company's stock price fell $2.87 per share, or 34%, from a closing price of $8.43 per share on August 8, 2022 to close at $5.56 per share on August 9, 2022.

5.      The truth fully emerged on November 3, 2022 when the Company filed its Form 10-Q with the SEC for the quarterly period ended September 30, 2022 (the "3Q22 10-Q"), which revealed that the year-by-year billable sample volume's "sequential growth was flat due to headwinds caused by limited commercial payer coverage." Defendant Dobak attributed the disappointing growth to "commercial payer collection challenges [having] affect[ed] estimating ASP [average selling price]." Due to the foregoing circumstances, the Company revealed that it expected "at least $13 million in assay revenue for the full-year 2022," which was "below [its] previous guidance range."

---

[1] https://www.bloomberg.com/profile/company/DMTK:US#xj4y7vzkg

6.      On this news, the Company's stock price fell $1.34 per share, or 44.67%, from a closing price of $3.00 per share on November 3, 2022 to close at $1.66 per share on November 4, 2022, on unusually heavy trading volume.

7.      During the Relevant Period, the Individual Defendants breached their fiduciary duties by personally making and/or causing the Company to make to the investing public a series of materially false and misleading statements regarding the Company's business, operations, and prospects. Specifically, the Individual Defendants willfully or recklessly made and/or caused the Company to make false and misleading statements that failed to disclose, *inter alia*, that: (1) DermTech experienced challenges with collections from commercial payors; (2) the challenges resulted in a lower average selling price for DermTech's DMT; (3) as a result of the foregoing, DermTech's revenue growth would be adversely impacted; and (4) the Company failed to maintain internal controls. As a result of the foregoing, Defendants' statements about the Company's business, operations, and prospects were materially false and misleading and/or lacked a reasonable basis at all relevant times.

8.      The Individual Defendants also breached their fiduciary duties by failing to correct and/or causing the Company to fail to correct these false and misleading statements and omissions of material fact to the investing public.

9.      Additionally, in breach of their fiduciary duties, the Individual Defendants caused the Company to fail to maintain adequate internal controls.

10.      In light of the Individual Defendants' misconduct—which has subjected the Company, its former Chief Executive Officer ("CEO"), and its Chief Financial Officer ("CFO") to being named as defendants in a federal securities fraud class action lawsuit pending in the United States District Court for the Southern District of California (the "Securities Class Action"), and which has further subjected the Company to the need to undertake internal investigations, the need to implement adequate internal controls, losses from the waste of corporate assets, and losses due to the unjust enrichment of Individual

Defendants who were improperly overcompensated by the Company and/or who benefitted from the wrongdoing alleged herein—the Company will have to expend many millions of dollars.

11.    The Company has been substantially damaged as a result of the Individual Defendants' knowing or highly reckless breaches of fiduciary duty and other misconduct.

12.    In light of the breaches of fiduciary duty engaged in by the Individual Defendants, most of whom are the Company's current directors, of their collective engagement in fraud, of the substantial likelihood of the directors' liability in this derivative action and of Defendant Dobak's and Defendant Sun's liability in the Securities Class Action, of their longstanding business and personal relationships with each other, and of their not being disinterested and/or independent directors, a majority of DermTech's Board of Directors (the "Board") cannot consider a demand to commence litigation against themselves and the other Individual Defendants on behalf of the Company with the requisite level of disinterestedness and independence.

## JURISDICTION AND VENUE

13.    This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 because Plaintiff's claims raise a federal question under Section 14(a) of the Exchange Act, 15 U.S.C. § 78n(a)(1) and Rule 14a-9 of the Exchange Act, 17 C.F.R. § 240.14a-9, Section 10(b) of the Exchange Act (15. U.S.C. § 78j(b)), and Section 21D of the Exchange Act (15 U.S.C. § 78u-4(f)). Plaintiff's claims also raise a federal question pertaining to the claims made in the Securities Class Action based on violations of the Exchange Act.

14.    This Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367(a).

15.    This derivative action is not a collusive action to confer jurisdiction on a court of the United States that it would not otherwise have.

16.    Venue is proper in this District pursuant to 28 U.S.C. §§ 1391 and 1401 because a substantial portion of the transactions and wrongs alleged herein, including the

preparation and dissemination of materially false and/or misleading information, occurred in this District.

## PARTIES

### Plaintiff

17.     Plaintiff is a current shareholder of DermTech. Plaintiff has continuously held DermTech common stock since January 20, 2021.

### Nominal Defendant DermTech

18.     Nominal Defendant DermTech is a Delaware corporation with its principal executive offices located at 12340 El Camino Real, San Diego, CA 92130. DermTech's shares trade on the NASDAQ under the ticker symbol "DMTK."

### Defendant Dobak

19.     Defendant Dobak served as the Company's CEO and as a Company director from August 2019 until he resigned effective September 30, 2023. According to the Company's proxy statement filed on Schedule 14A with the SEC on April 11, 2023 (the "2023 Proxy Statement"), as of March 15, 2023, Defendant Dobak beneficially owned 647,542 shares of the Company's common stock, representing 2.1% of the Company's total outstanding stock as of that date. Given that the price per share of the Company's stock at the close of trading on March 15, 2023 was $3.62, Defendant Dobak beneficially owned approximately $2,344,102 worth of DermTech stock.

20.     For the fiscal year ended December 31, 2022 (the "2022 Fiscal Year"), Defendant Dobak received $3,336,434 in total compensation from the Company. This included $597,400 in salary, $2,738,518 in stock awards, and $516 in all other compensation. For the fiscal year ended December 31, 2021, (the "2021 Fiscal Year"), Defendant Dobak received $3,382,178 in total compensation from the Company. This included $580,000 in salary, $1,298,591 in stock awards, $1,300,174 in option awards, $203,000 in non-equity incentive plan compensation, and $413 in all other compensation.

21.     The Company's 2023 Proxy Statement stated the following about Defendant Dobak:

> **John Dobak, M.D**. has served on our Board since the completion of the Business Combination in August 2019 and served on DermTech Operations' board of directors between June 2012 and August 2019. Dr. Dobak has served as our Chief Executive Officer since the completion of the Business Combination in August 2019 and served as Chief Executive Officer of DermTech Operations between June 2012 and August 2019. From 2006 until 2011, Dr. Dobak served as the founder and Chief Executive Officer of Lithera, Inc., a pharmaceutical company developing an injectable product for dermatology. Dr. Dobak is the founder and President of the JAKK Group, a life sciences technology accelerator, which has created several companies including Lithera, Inc., INNERCOOL Therapies, Inc., CryoGen, Inc., and CryoCor, Inc. Dr. Dobak's companies have developed and marketed therapeutics devices for endovascular hypothermia, cryosurgical cardiac catheters, and endometrial ablation. Dr. Dobak received a Bachelor's Degree from the University of California, Los Angeles and a Medical Doctorate from the University of California, San Diego. Dr. Dobak is qualified to serve on our Board because of his service as DermTech Operations' Chief Executive Officer, his service as a member of DermTech Operations' board of directors and his experience founding and operating multiple companies in the life sciences industry.

**Defendant Sun**

22.     Defendant Sun has served as the Company's CFO since September 2019. According to the 2023 Proxy Statement, as of March 15, 2023, Defendant Sun beneficially owned 199,335 shares of the Company's common stock. Given that the price per share of the Company's stock at the close of trading on March 15, 2023 was $3.62, Defendant Sun beneficially owned approximately $721,593 worth of DermTech stock.

23.     For the 2022 Fiscal Year, Defendant Sun received $1,461,528 in total compensation from the Company. This included $400,000 in salary, $999,607 in stock awards, $50,000 in non-equity incentive plan compensation, and $11,921 in all other compensation. For the 2021 Fiscal Year, Defendant Sun received $1,158,400 in total compensation from the Company. This included $370,000 in salary, $356,729 in stock

awards, $357,155 in option awards, $74,000 in non-equity incentive plan compensation, and $516 in all other compensation.

24.     The Company's 2023 Proxy Statement stated the following about Defendant Sun:

> **Kevin Sun** has served as our Chief Financial Officer, Treasurer and Secretary since September 2019. Mr. Sun joined DermTech Operations in August 2019 and served in the role of Vice President, Finance. From June 2008 to November 2018, Mr. Sun served in various management and executive roles for Dexcom, Inc. (Nasdaq:DXCM) including most recently as Vice President, Corporate Controller and Treasury from November 2017 to November 2018, as Interim Chief Financial Officer from April 2017 to September 2017, as Vice President, Finance from February 2016 to November 2017, and as Senior Director, Finance from March 2014 to February 2016. Prior to Dexcom, Mr. Sun held various roles of increasing responsibility at Biosite Incorporated from 2004 to 2008, most recently as Senior Manager, Financial Planning and Analysis. Mr. Sun holds a B.S. in Business with a dual major in Accounting and Finance, a minor in Psychology, a Masters in Strategic Management and an MBA from the Kelley School of Business at Indiana University.

**Defendant Capone**

25.     Defendant Capone has served as a Company director since July 18, 2022. He also serves as a member of the Audit Committee. According to the 2023 Proxy Statement, as of March 15, 2023, Defendant Capone beneficially owned 19,860 shares of the Company's common stock. Given that the price per share of the Company's stock at the close of trading on March 15, 2023 was $3.62, Defendant Capone beneficially owned approximately $71,893 worth of DermTech stock.

26.     For the 2022 Fiscal Year, Defendant Capone received $312,429 in total compensation from the Company. This included $19,565 in fees earned or paid in cash and $292,864 in stock awards.

27.     The Company's 2023 Proxy Statement stated the following about Defendant Capone:

> **Mark Capone** has served on our Board since July 2022. Mr. Capone currently serves as the Chief Executive Officer of Precision Medicine Advisors, LLC.

From July 2015 to February 2020, Mr. Capone was the President and Chief Executive Officer of Myriad Genetics, Inc. (Nasdaq:MYGN), which he transformed from a pioneering start-up to one of the largest precision medicine companies in the world. During his 17-year tenure, Myriad Genetics developed and launched more than a dozen reimbursed molecular diagnostics, achieving total annual revenues of more than $800 million. Prior to Myriad Genetics, Mr. Capone spent 17 years at Eli Lilly and Company (NYSE:LLY) in various leadership positions. Mr. Capone is currently a non-executive board member of Abcam plc (Nasdaq:ABCM). Mr. Capone received a B.S. in Chemical Engineering from Penn State University graduating with highest distinction, and his M.S. in Chemical Engineering (biotechnology emphasis) and Management from the Massachusetts Institute of Technology. Mr. Capone is qualified to serve on our Board because of his experience serving as the Chief Executive Officer for a life sciences company and his experience serving on numerous boards of directors.

**Defendant Collins**

28.     Defendant Collins has served as a Company director since August 2019. She also serves as Chair of the Nominating and Corporate Governance Committee, as a member of the Audit Committee, and as a member of the Compensation Committee. According to the 2023 Proxy Statement, as of March 15, 2023, Defendant Collins beneficially owned 69,121 shares of the Company's common stock. Given that the price per share of the Company's stock at the close of trading on March 15, 2023 was $3.62, Defendant Collins beneficially owned approximately $250,218 worth of DermTech stock.

29.     For the 2022 Fiscal Year, Defendant Collins received $240,177 in total compensation from the Company. This included $67,000 in fees earned or paid in cash and $173,177 in stock awards. For the 2021 Fiscal Year, Defendant Collins received $432,475 in total compensation from the Company. This included $63,500 in fees earned or paid in cash and $368,975 in stock awards.

30.     The Company's 2023 Proxy Statement stated the following about Defendant Collins:

*Cynthia Collins* has served on our Board since the completion of the Business Combination in August 2019 and on DermTech Operations' board of directors between July 2018 and August 2019. Ms. Collins served as Chief Executive

Officer of Editas Medicine, Inc. (Nasdaq:EDIT) from March 2019 to February 2021 and served as a member of the board of directors of Editas Medicine from December 2018 to February 2021. Ms. Collins served as Chief Executive Officer of Human Longevity Inc. from January 2017 to December 2017. Before that, Ms. Collins served as the Chief Executive Officer and General Manager of General Electric's (NYSE:GE) Healthcare Cell Therapy and Lab Businesses from April 2015 to December 2016, and as Chief Executive Officer of General Electric's Clarient Diagnostics, Inc. division from October 2013 to April 2015. Prior to that, Ms. Collins served as CEO of GenVec, Inc. (Nasdaq:GNVC) from May 2012 to September 2013. Before that, she served as Group Vice President, Cellular Analysis Business of Beckman Coulter Inc. from 2007 to 2011 and as CEO of Sequoia Pharmaceuticals, Inc. Ms. Collins is currently a member of the board of directors of Certara, Inc. (Nasdaq:CERT) and Poseida Therapeutics, Inc. (Nasdaq:PSTX). Ms. Collins received her BS degree in Microbiology from the University of Illinois, Urbana and her MBA from The University of Chicago Booth School of Business. Ms. Collins is qualified to serve on our Board because of her broad experience serving as the Chief Executive Officer for a variety of companies in the life sciences industry and her experience serving on numerous boards of directors.

**Defendant Keraudy**

31.     Defendant Keraudy has served as a Company director since October 2021. She also serves as a member of the Nominating and Corporate Governance Committee. According to the 2023 Proxy Statement, as of March 15, 2023, Defendant Keraudy beneficially owned 30,977 shares of the Company's common stock. Given that the price per share of the Company's stock at the close of trading on March 15, 2023 was $3.62, Defendant Keraudy beneficially owned approximately $112,137 worth of DermTech stock.

32.     For the 2022 Fiscal Year, Defendant Keraudy received $217,048 in total compensation from the Company. This included $43,871 in fees earned or paid in cash and $173,177 in stock awards. For the 2021 Fiscal Year, Defendant Keraudy received $249,240 in total compensation from the Company. This included $10,000 in fees earned or paid in cash and $239,240 in stock awards

33.     The Company's 2023 Proxy Statement stated the following about Defendant Keraudy:

> **_Nathalie Gerschtein Keraudy_** has served on our Board since October 2021. Ms. Gerschtein Keraudy currently serves as the President of Consumer Products Division for the North America Zone of L'Oréal Group, a leading global beauty company. In her current role, Ms. Gerschtein Keraudy is responsible for accelerating growth, innovation, and sustainable practices across North America's mass market portfolio of brands and product categories. This extensive portfolio includes some of the most trusted and iconic brands such as L'Oréal Paris, Maybelline New York, Garnier, and NYX Professional Makeup, in addition to Essie, Thayer's Natural Remedies, Carol's Daughter, and Softsheen-Carson. Through an appointment by the French Prime Minister, Ms. Gerschtein Keraudy also serves as a French Foreign Trade Advisor. Ms. Gerschtein Keraudy is a graduate of HEC School of Management in Paris, the London Business School, and INSEAD's senior executive leadership program. Ms. Gerschtein Keraudy is qualified to serve on our Board because of her broad experience as an executive in the direct-to-consumer skin care industry.

**Defendant Malloy**

34.     Defendant Malloy has served as a Company director since July 18, 2022. He also serves as a member of the Compensation Committee. According to the 2023 Proxy Statement, as of March 15, 2023, Defendant Malloy beneficially owned 4,405 shares of the Company's common stock. Given that the price per share of the Company's stock at the close of trading on March 15, 2023 was $3.62, Defendant Malloy beneficially owned approximately $15,946 worth of DermTech stock.

35.     For the 2022 Fiscal Year, Defendant Malloy received $312,005 in total compensation from the Company. This included $19,141 in fees earned or paid in cash and $292,864 in stock awards.

36.     The Company's 2023 Proxy Statement stated the following about Defendant Malloy:

> **_Kirk Malloy, Ph.D._** has served on our Board since July 2022. Dr. Malloy is currently the Founder and Principal at BioAdvisors, LLC, where he provides strategic consulting services to life sciences, diagnostics, and genomics

companies. From August 2017 to August 2018, Dr. Malloy served as Chief Executive Officer of Verogen, Inc., a biotechnology company focused on the development and supply of next-generation sequencing-based human identification products. Prior to Verogen, Dr. Malloy held numerous positions at Illumina, Inc. (Nasdaq:ILMN) from 2002 to 2016, most recently as Senior Vice President and General Manager of Life Sciences and Applied Markets. Dr. Malloy currently serves as a director for NanoString Technologies, Inc. (Nasdaq:NSTG). Dr. Malloy earned his B.S. in Biology from the University of Miami, and his M.S. and Ph.D. from the University of Delaware, and has held post-doctoral and instructor positions at Boston University and Northeastern University. Dr. Malloy is qualified to serve on our Board because of his extensive experience as an executive and as a member on various boards of directors of companies in the life sciences industry.

**Defendant Posard**

37.     Defendant Posard has served as the Chairman of the Board and as a Company director since August 2019. He also serves as Chair of the Compensation Committee and as a member of the Nominating and Corporate Governance Committee. According to the 2023 Proxy Statement, as of March 15, 2023, Defendant Posard beneficially owned 122,501 shares of the Company's common stock. Given that the price per share of the Company's stock at the close of trading on March 15, 2023 was $3.62, Defendant Posard beneficially owned approximately $443,454 worth of DermTech stock.

38.     For the 2022 Fiscal Year, Defendant Posard received $272,177 in total compensation from the Company. This included $99,000 in fees earned or paid in cash and $173,177 in stock awards. For the 2021 Fiscal Year, Defendant Posard received $460,195 in total compensation from the Company. This included $92,000 in fees earned or paid in cash and $368,975 in stock awards.

39.     The Company's 2023 Proxy Statement stated the following about Defendant Posard:

*Matthew L. Posard* has served as Chairman of our Board since the completion of the Business Combination in August 2019, served on DermTech Operations' board of directors between 2016 and August 2019, and served as Chairman of DermTech Operations' board of directors between June 2019 and August 2019. Mr. Posard currently serves as Founding Principal at

Explore-DNA, a Life Sciences and Diagnostics consulting firm. Mr. Posard served as the President and Chief Commercial Officer of GenePeeks, Inc. from February 2017 to April 2018 and as Executive Vice President and Chief Commercial Officer at Trovagene, Inc. (now Cardiff Oncology, Inc. (Nasdaq:CRDF)) from March 2015 to April 2016. Mr. Posard also held multiple executive leadership roles at Illumina, Inc. (Nasdaq:ILMN) from 2006 to 2015. Mr. Posard is currently on the boards of Halozyme Therapeutics, Inc. (Nasdaq:HALO) and Talis BioMedical Corporation (Nasdaq:TLIS), and is Executive Chairman of Nautilus Biotechnology, Inc. (Nasdaq:NAUT). Mr. Posard holds a bachelor's degree in Management Science from the University of California, San Diego. Mr. Posard is qualified to serve on our Board because of his extensive experience as an executive and serving on various boards of directors of companies in the life sciences industry, including DermTech Operations.

**Defendant Tellado**

40.     Defendant Tellado served as a Company director from July 2021 until her term expired effective May 31, 2023. While serving on the Board, she also served as a member of the Audit Committee. According to the 2023 Proxy Statement, as of March 15, 2023, Defendant Tellado beneficially owned 98,862 shares of the Company's common stock. Given that the price per share of the Company's stock at the close of trading on March 15, 2023 was $3.62, Defendant Tellado beneficially owned approximately $357,880 worth of DermTech stock.

41.     For the 2022 Fiscal Year, Defendant Tellado received $223,177 in total compensation from the Company. This included $50,000 in fees earned or paid in cash and $173,177 in stock awards. For the 2021 Fiscal Year, Defendant Tellado received $359,072 in total compensation from the Company. This included $25,000 in fees earned or paid in cash and $334,072 in stock awards.

42.     The Company's proxy statement filed on Schedule 14A with the SEC on April 14, 2022 (the "2022 Proxy Statement") stated the following about Defendant Tellado:

*Monica Tellado* has served on our Board since July 2021. In April 2022, Ms. Tellado joined HeartFlow, Inc. as its Chief Financial Officer. From 2005 to April 2022, Ms. Tellado served as Senior Vice President of Finance at Gilead Sciences, Inc., a public research-based biopharmaceutical company that

focuses on researching and developing antiviral drugs used in the treatment of HIV, hepatitis B, hepatitis C, and influenza, including Harvoni and Sovaldi. Ms. Tellado previously held roles of progressive responsibility in the finance and commercial organizations at Gilead and as the Senior Vice President of Finance at Gilead, Ms. Tellado was responsible for overseeing the global finance teams as well as investor relations. At Gilead, Ms. Tellado was also responsible for the U.S. and Latin American commercial markets, led preparations to enter new markets and launch new products within Gilead's HIV, Liver, Cardiopulmonary, and Oncology business units and was responsible for the U.S. Liver Disease business unit including a P&L of nearly $2 billion. Prior to joining Gilead, Ms. Tellado held numerous Finance positions at Intel Corporation and Ford Motor Company. Ms. Tellado holds a B.A. in Business Administration from Universidad Pontificia Comillas in Madrid, Spain and London, England and an M.B.A. from Carnegie Mellon University. Ms. Tellado is qualified to serve on our Board because of her extensive experience serving in progressive leadership roles in the biotech industry.

**Defendant Picozza**

43.     Defendant Picozza served as a Company director from August 2019 until his term expired effective May 26, 2022. According to the 2022 Proxy Statement, as of April 1, 2022, Defendant Picozza beneficially owned 18,497 shares of the Company's common stock. Given that the price per share of the Company's stock at the close of trading on April 1, 2022 was $15.78, Defendant Picozza beneficially owned approximately $291,882 worth of DermTech stock.

44.     For the 2022 Fiscal Year, Defendant Picozza received $16,212 in total compensation from the Company, consisting entirely of fees earned or paid in cash. For the 2021 Fiscal Year, Defendant Picozza received $359,072 in total compensation from the Company. This included $40,000 in fees earned or paid in cash and $368,975 in stock awards.

45.     The Company's Schedule 14A filed with the SEC on April 16, 2021 (the "2021 Proxy Statement") stated the following about Defendant Picozza:

*Enrico Picozza* has served on our Board since the completion of the Business Combination in August 2019. Since 2011, Mr. Picozza has served as partner

of HLM Venture Partners, a venture firm that invests in tech-enabled healthcare services, healthcare information technology, and medical device and diagnostics companies. From 2018 to present, Mr. Picozza has served on the board of RubiconMD, Inc., an eConsult platform focused on eliminating unnecessary visits to specialists and providing better care and cost saving to patients and health systems. From 2016 to present, Mr. Picozza has served on the board of mPulse Mobile, Inc., a provider of conversational artificial intelligence solutions for the healthcare industry. From 2016 to present, Mr. Picozza has also served on the board of Able To, Inc., a provider of virtual behavioral healthcare. Mr. Picozza also currently serves on the council of advisors of BioAccel, a non-profit organization. From 2015 to 2018, Mr. Picozza served on the board of Aventura HQ, Inc., a developer of a software solution designed to simplify usability of electronic medical records in hospital settings. From 2016 to 2018, Mr. Picozza served on the board of Spinal Kinetics, Inc., a provider of freedom of motion spinal disk implants. From 2015 to 2017, Mr. Picozza served as chairman of the board of Vericare Management, Inc., a provider of behavioral health services and drug management, which merged with Medoptions, Inc. in 2016. From 2015 to 2017, Mr. Picozza also served on the board of Medicalis Corporation, a provider of a decision support platform designed to streamline the radiology approval process. From 2015 to 2016, Mr. Picozza served on the board of Transcend Medical, makers of an implantable device to help regulate interocular pressure for patients with glaucoma. Mr. Picozza has extensive management experience, including his experience in various leadership roles he held at Applied Biosystems, Inc. and PerkinElmer, Inc., where he was involved in the development and commercialization of polymerase chain reaction technology, and as a co-founder of HTS Biosystems, Inc., which was sold to Biacore International AB in 2005. Mr. Picozza is the inventor on several patents, the author of numerous scientific papers and a frequent domestic and international speaker. Mr. Picozza received his Bachelor of Science from the University of Connecticut in 1984 and attended the University of Connecticut for post-graduate studies while working at PerkinElmer, Inc. Mr. Picozza is qualified to serve on our Board because of his considerable experience serving as an officer and as a director of multiple life sciences companies.

**Defendant Rosenman**

46.     Defendant Rosenman has served as a Company director since August 2019. He also serves as Chair of the Audit Committee. According to the 2023 Proxy Statement, as of March 15, 2023, Defendant Rosenman beneficially owned 98,862 shares of the

Company's common stock. Given that the price per share of the Company's stock at the close of trading on March 15, 2023 was $3.62, Defendant Rosenman beneficially owned approximately $357,880 worth of DermTech stock.

47.     For the 2022 Fiscal Year, Defendant Rosenman received $239,854 in total compensation from the Company. This included $66,677 in fees earned or paid in cash and $173,177 in stock awards. For the 2021 Fiscal Year, Defendant Rosenman received $435,975 in total compensation from the Company. This included $67,000 in fees earned or paid in cash and $368,975 in stock awards.

48.     The Company's 2023 Proxy Statement stated the following about Defendant Rosenman:

> ***Herm Rosenman*** has served on our Board since the completion of the Business Combination in August 2019 and on DermTech Operations' board of directors between February 2017 and August 2019. Additionally, Mr. Rosenman served as Chief Financial Officer of Natera Inc. (Nasdaq:NTRA) from February 2014 to January 2017 and has served on its board of directors since February 2017. Prior to Natera, Mr. Rosenman served as Senior Vice President of Finance and Chief Financial Officer at Gen-Probe Incorporated, or Gen-Probe, a developer, manufacturer and marketer of diagnostic and screening products using nucleic acid probes, from June 2001 to October 2012, when Gen-Probe was acquired by Hologic, Inc., a diagnostic products, medical imaging systems, and surgical products company. Mr. Rosenman holds a B.B.A. in accounting and finance from Pace University and an M.B.A. from the Wharton School of the University of Pennsylvania. Mr. Rosenman is qualified to serve on our Board because of his experience serving as the chief financial officer and as a director of multiple life sciences companies.

## FIDUCIARY DUTIES OF THE INDIVIDUAL DEFENDANTS

49.     By reason of their positions as officers and/or directors of DermTech, and because of their ability to control the business and corporate affairs of DermTech, the Individual Defendants owed DermTech and its shareholders fiduciary obligations of trust, loyalty, good faith, and due care, and were and are required to use their utmost ability to control and manage DermTech in a fair, just, honest, and equitable manner. The Individual

Defendants were and are required to act in furtherance of the best interests of DermTech and its shareholders so as to benefit all shareholders equally.

50.   Each director and officer of the Company owes to DermTech and its shareholders the fiduciary duty to exercise good faith and diligence in the administration of the Company and in the use and preservation of its property and assets and the highest obligations of fair dealing.

51.   The Individual Defendants, because of their positions of control and authority as directors and/or officers of DermTech, were able to and did, directly or indirectly, exercise control over the wrongful acts complained of herein.

52.   To discharge their duties, the officers and directors of DermTech were required to exercise reasonable and prudent supervision over the management, policies, controls, and operations of the Company.

53.   Each Individual Defendant, by virtue of his or her position as a director and/or officer, owed to the Company and to its shareholders the highest fiduciary duties of loyalty, good faith, and the exercise of due care and diligence in the management and administration of the affairs of the Company, as well as in the use and preservation of its property and assets. The conduct of the Individual Defendants complained of herein involves a knowing and culpable violation of their obligations as directors and officers of DermTech, the absence of good faith on their part, or a reckless disregard for their duties to the Company and its shareholders that the Individual Defendants were aware or should have been aware posed a risk of serious injury to the Company.

54.   As senior executive officers and directors of a publicly-traded company whose common stock was registered with the SEC pursuant to the Exchange Act and traded on NASDAQ, the Individual Defendants had a duty to prevent and not to effect the dissemination of inaccurate and untruthful information with respect to the Company's financial condition, performance, growth, operations, financial statements, business, products, management, earnings, internal controls, and present and future business

prospects, including the dissemination of false information regarding the Company's business, prospects, and operations, and had a duty to cause the Company to disclose in its regulatory filings with the SEC all those facts described in this Complaint that it failed to disclose, so that the market price of the Company's common stock would be based upon truthful and accurate information.

55.    To discharge their duties, the officers and directors of DermTech were required to exercise reasonable and prudent supervision over the management, policies, practices, and internal controls of the Company. By virtue of such duties, the officers and directors of DermTech were required to, among other things:

(a)    ensure that the Company was operated in a diligent, honest, and prudent manner in accordance with the laws and regulations of Delaware, California, and the United States, and pursuant to DermTech's own Corporate Code of Conduct and Ethics and Whistleblower Policy (the "Code of Conduct");

(b)    conduct the affairs of the Company in an efficient, business-like manner so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

(c)    remain informed as to how DermTech conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, to make reasonable inquiry in connection therewith, and to take steps to correct such conditions or practices;

(d)    establish and maintain systematic and accurate records and reports of the business and internal affairs of DermTech and procedures for the reporting of the business and internal affairs to the Board and to periodically investigate, or cause independent investigation to be made of, said reports and records;

(e)    maintain and implement an adequate and functioning system of internal legal, financial, and management controls, such that DermTech's operations would comply with all applicable laws and DermTech's financial statements and regulatory filings filed

with the SEC and disseminated to the public and the Company's shareholders would be accurate;

(f)     exercise reasonable control and supervision over the public statements made by the Company's officers and employees and any other reports or information that the Company was required by law to disseminate;

(g)     refrain from unduly benefiting themselves and other Company insiders at the expense of the Company; and

(h)     examine and evaluate any reports of examinations, audits, or other financial information concerning the financial affairs of the Company and to make full and accurate disclosure of all material facts concerning, *inter alia*, each of the subjects and duties set forth above.

56.     Each of the Individual Defendants further owed to DermTech and the shareholders the duty of loyalty requiring that each favor DermTech's interest and that of its shareholders over their own while conducting the affairs of the Company and refrain from using their position, influence or knowledge of the affairs of the Company to gain personal advantage.

57.     At all times relevant hereto, the Individual Defendants were the agents of each other and of DermTech and were at all times acting within the course and scope of such agency.

58.     Because of their advisory, executive, managerial, and directorial positions with DermTech, each of the Individual Defendants had access to adverse, non-public information about the Company.

59.     The Individual Defendants, because of their positions of control and authority, were able to and did, directly or indirectly, exercise control over the wrongful acts complained of herein, as well as the contents of the various public statements issued by DermTech.

Verified Shareholder Derivative Complaint

## CONSPIRACY, AIDING AND ABETTING, AND CONCERTED ACTION

60.   In committing the wrongful acts alleged herein, the Individual Defendants have pursued, or joined in the pursuit of, a common course of conduct, and have acted in concert with and conspired with one another in furtherance of their wrongdoing. The Individual Defendants caused the Company to conceal the true facts as alleged herein. The Individual Defendants further aided and abetted and assisted each other in breaching their respective duties.

61.   The purpose and effect of the conspiracy, common enterprise, and common course of conduct was, among other things, to: (i) facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, unjust enrichment, waste of corporate assets, and violations of the Exchange Act; (ii) conceal adverse information concerning the Company's operations, financial condition, legal compliance, future business prospects and internal controls; and (iii) artificially inflate the Company's stock price.

62.   The Individual Defendants accomplished their conspiracy, common enterprise, and common course of conduct by causing the Company purposefully or recklessly to conceal material facts, fail to correct such misrepresentations, and violate applicable laws. In furtherance of this plan, conspiracy, and course of conduct, the Individual Defendants collectively and individually took the actions set forth herein. Because the actions described herein occurred under the authority of the Board, each of the Individual Defendants who is a director of DermTech was a direct, necessary, and substantial participant in the conspiracy, common enterprise, and common course of conduct complained of herein.

63.   Each of the Individual Defendants aided and abetted and rendered substantial assistance in the wrongs complained of herein. In taking such actions to substantially assist the commission of the wrongdoing complained of herein, each of the Individual Defendants acted with actual or constructive knowledge of the primary wrongdoing, either took direct

part in, or substantially assisted in the accomplishment of that wrongdoing, and was or should have been aware of his or her overall contribution to and furtherance of the wrongdoing.

64.     At all times relevant hereto, each of the Individual Defendants was the agent of each of the other Individual Defendants, and of DermTech, and was at all times acting within the course and scope of such agency.

## DERMTECH'S CODE OF CONDUCT AND CORPORATE GOVERNANCE

### *Corporate Code of Conduct and Ethics and Whistleblower Policy*

65.     The Company's Code of Conduct starts by stating that it was adopted "to provide our associates […] with a clear understanding of the principles of business conduct and ethics that are expected of them and to aid them in making decisions when conducting the Company's business and performing day-to-day duties" and further notes that "[t]he standards set forth in the Code apply to […] all [employees]."

66.     Under the heading "Reporting Violations Under the Code; Anti-Retaliation Pledge," the Code of Conduct states, "It is the responsibility of each of us to conduct ourselves in an ethical business manner and also to ensure that others do the same." It continues that, "If any one of us violates these standards, he or she can expect a disciplinary response, including, but not limited to, termination of employment or other relationship with the Company or, potentially, legal action."

67.     The Code of Conduct provides, as to "Complying with the Code," that:

> The ultimate responsibility for maintaining the Code rests with each of us. As individuals of personal integrity, we can do no less than to behave in a way that will continue to bring credit to ourselves and our company. Applying these standards to our business lives is an extension of the values by which we are known as individuals and by which we want to be known as a company.
>
> \*          \*          \*
>
> It is our responsibility to conduct ourselves in an ethical business manner and also to ensure that others do the same. If any one of us violates these standards, he or she can expect a disciplinary response, up to and including termination of employment or other relationship with the Company or, potentially, legal action.

68.    Under the heading "Who is responsible for administering, updating and enforcing the Code?" the Code of Conduct states, "[t]he Board has appointed a Corporate Compliance Officer to administer, update and enforce the Code. Ultimately, the Board of Directors of the company must ensure that the Corporate Compliance Officer and each similar Board of Director designee fulfill his or her responsibilities."

69.    Under the heading "General Requirements," the Code of Conduct states the following:

> Each of us is expected to be honest, fair, and accountable in all business dealings and obligations, and to ensure:
>
> - the ethical handling of conflicts of interest between personal and professional relationships;
>
> - full, fair, accurate, timely and understandable disclosure in the reports required to be filed by the Company with the Securities and Exchange Commission (the "SEC") and in other public communications made by the Company; and
>
> - compliance with applicable governmental laws, rules and regulations.

70.    The Code of Conduct provides, as to "Conflicts of Interest," the following, in relevant part:

> Associates should use their best efforts to avoid any situation that may involve, or even appear to involve, a conflict between their personal interests and the interests of the Company. In dealings with current or potential customers, suppliers, contractors, and competitors, each associate should act in the best interests of the Company to the exclusion of personal advantage. Immediate family members of associates, executive officers and directors are also covered in certain circumstances[.]

71.    The Code of Conduct provides, as to "Confidential Information," that:

> The Company provides its associates with confidential information relating to the Company and its business with the understanding that such information is to be held in confidence and not communicated to anyone who is not authorized to see it, except as may be required by law. The types of information that each associate must safeguard include, by way of example only, to the extent unannounced or otherwise nonpublic, the Company's plans

and business strategy; inventions, discoveries, clinical and nonclinical data, results, protocols or other similar information; products; product candidates; intellectual property, regulatory, corporate partnering or M&A information, developments, prospects or communications; contracts; sales data; significant projects; customer and supplier lists; trade secrets; manufacturing techniques and sensitive financial information, in each case whether in electronic or paper format. These are costly, valuable resources developed for the exclusive benefit of the Company. No associate shall disclose the Company's confidential information to an unauthorized third party or use the Company's confidential information for his or her own personal benefit.

72.    The Code of Conduct provides, as to "Accurate Records and Reporting," that:

Under law, the Company is required to keep books, records and accounts that accurately and fairly reflect all Company transactions, dispositions of assets and other events that are the subject of specific regulatory record keeping requirements, including generally accepted accounting principles and other applicable rules, regulations and criteria for preparing financial statements and for preparing periodic reports filed with the SEC. All Company reports, accounting records, sales reports, expense accounts, invoices, purchase orders, and other documents must accurately and clearly represent the relevant facts and the true nature of transactions. Reports and other documents should state all material facts of a transaction and not omit any information that would be important in interpreting such report or document. Under no circumstance shall there be any unrecorded liability or fund of the Company, regardless of the purposes for which the liability or fund may have been intended, or any improper or inaccurate entry knowingly made on the books or records of the Company. No payment on behalf of the Company may be approved or made with the intention, understanding or awareness that any part of the payment is to be used for any purpose other than that described by the documentation supporting the payment. In addition, intentional accounting misclassifications (e.g., expense versus capital) and intentional improper acceleration or deferral of expenses or revenues are unacceptable reporting practices that are expressly prohibited.

The Company has or will develop and maintain (a) a system of internal controls to provide reasonable assurance that transactions are executed in accordance with management's authorization, are properly recorded and posted and are in compliance with regulatory requirements and (b) disclosure controls and procedures to ensure that all of the information required to be disclosed by the Company in the reports that it files or submits under the Securities Exchange Act of 1934, as amended, is recorded, processed,

summarized and reported within the time periods specified by the SEC's rules and forms.

\*          \*          \*

**Because the integrity of the Company's external reports to stockholders and the SEC depends on the integrity of the Company's internal reports and recordkeeping, all associates must adhere to the highest standards of care with respect to our internal records and reporting. The Company is committed to full, fair, accurate, timely, and understandable disclosure in its periodic reports required to be filed with the SEC[.]**

(Emphasis in original.)

73.    The Code of Conduct provides, as to "Misrepresentations of Price and Product," that:

Lies or misrepresentations about the nature, quality or character of any Company product, product candidate or service are both illegal and contrary to Company policy.

74.    Under the heading "Compliance with Laws, Rules and Regulations," the Code of Conduct provides the following, in relevant part:

**A. Insider Trading Policy**
The Company expressly forbids any associate from trading on material nonpublic information or communicating material nonpublic information to others in violation of the law. This conduct is frequently referred to as "insider trading." This policy applies to every associate and extends to activities both within and outside their duties to the Company, including trading for a personal account.

The concept of who is an "insider" is broad. It includes officers, directors and employees of a company. In addition, a person can be a "temporary insider" if he or she enters into a special confidential relationship in the conduct of a company's affairs and as a result is given access to information solely for the company's purpose. A temporary insider can include, among others, a company's investment advisors, agents, attorneys, accountants and lending institutions, as well as the employees of such organizations. One may also become a temporary insider of another company with which the Company has a contractual or other relationship.

Trading while aware of inside information is not a basis for liability unless the information is material. Generally, this is information that a reasonable

investor would consider important in making his or her investment decisions or information that is likely to have a significant effect on the price of a company's securities.

Information is nonpublic until it has been effectively communicated to the marketplace. Tangible evidence of such dissemination is the best indication that the information is public. For example, information found in a report filed with the SEC or appearing in a national newspaper would be considered public.

***Audit Committee Charter***

75.   The DermTech, Inc. Amended and Restated Audit Committee Charter (the "Audit Committee Charter") defines the responsibilities of the Company's Audit Committee.

76.   Per the Audit Committee Charter, the purpose of the Audit Committee is to:

[P]rovide assistance to the Board of Directors (the "Board") of DermTech, Inc. (the "Corporation") in fulfilling the Board's responsibility to the Corporation's stockholders relating to the Corporation's accounting and financial reporting practices and system of internal control, the audit process, the quality and integrity of the Corporation's financial reporting, and the Corporation's process for monitoring compliance with laws and regulations and its code of conduct.

The Committee's responsibility is oversight. Management of the Corporation has the responsibility for the Corporation's financial statements as well as the Corporation's financial reporting process, principles, and internal controls. The independent registered public accounting firm engaged by the Corporation (the "independent auditor") is responsible for performing an audit of the Corporation's annual financial statements, expressing an opinion as to the conformity of such annual financial statements with generally accepted accounting principles, reviewing the Corporation's quarterly financial statements and other procedures. Each member of the Committee shall be entitled to rely on (i) the integrity of those persons within the Corporation and of the professionals and experts (such as the independent auditor) from which it receives information, (ii) the accuracy of the financial and other information provided to the Committee by such persons, professionals or experts absent actual knowledge to the contrary and (iii) representations made by management of the independent auditor as to any non-audit services provided by the independent auditor to the Corporation."

77.     The  Audit  Committee  Charter  lists,  among  the  Audit  Committee's responsibilities, the following:

- Appoint, compensate, and oversee the work of any independent auditor;

- Resolve any disagreements between management and the independent auditor regarding financial reporting;

- Pre-approve all audit and permitted non-audit services by the independent auditor;

- Retain independent counsel, accountants, or other advisors or consultants to advise and assist the Committee in carrying out its duties, without needing to seek approval for the retention of such advisors or consultants from the Board, and determine the appropriate compensation for any such advisors or consultants retained by the Committee;

- Seek any information it requires from employees of the Corporation or any direct or indirect subsidiary of the Corporation (each, a "Subsidiary"), all of whom are directed to cooperate with the Committee's requests, or external parties;

- Meet with any officer or employee of the Corporation (or any Subsidiary), the independent auditor or outside counsel, as necessary, or request that any such persons meet with any members of, or advisors or consultants to, the Committee; and

- Oversee that management has established and maintained processes to assure compliance by the Corporation with applicable laws, regulations and corporate policy.

*              *              *

**Document Review and Reporting Process**

- Review with management and the independent auditor the Corporation's annual financial statements and Form 10-K prior to the filing of the Form 10-K or prior to the release of earnings, including a discussion with the independent auditor of the matters required to be

discussed under the applicable Statements of Auditing Standards ("SAS").

- Review with management and the independent auditor each Form 10-Q prior to its filing or prior to the release of earnings, including a discussion with the independent auditor of the matters required to be discussed under SAS. The Chairperson may represent the entire Committee for purposes of this review

- Review with management and the independent auditor the effect of regulatory and accounting initiatives that may affect the Corporation, as well as the effect of any off-balance sheet structures and transactions on the Corporation's financial statements.

- Regularly report to the Board about the Committee's activities, issues, and related recommendations.

                    *              *              *

- Review any other reports the Corporation issues that relate to the Committee's responsibilities

                    *              *              *

- Confirm annually that all responsibilities outlined in this Charter have been carried out

**<u>Financial Reporting Process</u>**

- In consultation with the independent auditor and the chief financial officer, review the integrity of the Corporation's financial reporting processes and the coordination of the internal audit function, if any, with the independent auditor. The Committee shall report regularly to and review with the full Board any issues that arise with respect to the quality or integrity of the Corporation's financial reporting, compliance with legal or regulatory requirements, the performance and independence of the independent auditor, or the performance of the internal audit function, if any.

                    *              *              *

- Ensure that there exist regular systems of reporting to the Committee by each of management, the independent auditor and the chief financial officer regarding any significant judgments made in management's preparation of the financial statements and any significant difficulties

encountered during the course of the review or audit, including any restrictions on the scope of work or access to required information

**Financial Statements**

- Review significant accounting and reporting issues, including complex or unusual transactions (such as off-balance sheet structures, if any) and highly judgmental areas, and recent professional and regulatory pronouncements, and understand their impact on the financial statements.

  \*        \*        \*

- Review the annual audited financial statements, consider whether they are complete, consistent with information known to the Committee members and reflect appropriate accounting principles; and, following consultation with management and the independent auditor, consider whether to formally recommend to the Board that they be included in the Corporation's annual report on Form 10-K.

- Review other financial or risk-related sections of the annual report and related regulatory filings before release and consider the accuracy and completeness of the information.

  \*        \*        \*

- Review interim financial statements with management and the independent auditor before filing with regulators, and consider whether financial statements are complete and consistent with the information known to the Committee members.

**Internal Controls**

- Understand how the internal audit function, if any, has implemented and maintains the Corporation's internal controls and the process for the independent auditor's review of the internal controls. Obtain reports on significant findings and recommendations regarding effectiveness of the controls, together with management's response.

- Consider and review with the independent auditor the effectiveness of the Corporation's internal control system, including information technology security and control.

- Review management's annual internal control report which acknowledges management's responsibility for establishing and maintaining an adequate internal control structure and procedures for financial reporting; and contains an assessment of the effectiveness of the internal control structure.

## **Risk Oversight/General**

- Discuss with management and the independent auditor policies and programs with respect to risk management and risk assessment and inquire about risks or exposures facing the Corporation

- Review, with the Corporation's counsel, any legal or regulatory matter that could have a significant impact on the Corporation's financial statements.

                    *                    *                    *

- Establish procedures for (i) the receipt, retention, and treatment of complaints received by the Corporation from external parties regarding accounting, internal accounting controls, or auditing matters; and (ii) the confidential, anonymous submission by employees of the Corporation or any Subsidiary of concerns regarding questionable accounting or auditing matters, whether through the whistleblower hotline or other reporting channels. Ensure such procedures maintain the confidentiality and anonymity of persons reporting violations or suspected violations and ensure that the Corporation does not take retaliatory actions against those reporting.

- Review the effectiveness of the system for monitoring compliance with laws and regulations and the results of management's investigation and follow-up (including disciplinary action) of any instances of noncompliance.

- Review the findings of any examinations by regulatory agencies, and any auditor observations.

- Review the process for communicating the code of conduct to the Corporation's personnel, and for monitoring compliance therewith, including the establishment of procedures to ensure open and regular communications with the Corporation's Compliance Committee.

Verified Shareholder Derivative Complaint

- Obtain regular updates from management and the Corporation's legal counsel regarding compliance matters.

78.     In violation of the Code of Conduct, the Individual Defendants conducted little, if any, oversight of the Company's engagement in the Individual Defendants' scheme to issue materially false and misleading statements to the public and to facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, unjust enrichment, gross mismanagement, waste of corporate assets, abuse of control, and violations of the Exchange Act. Moreover, in violation of the Code of Conduct, the Individual Defendants failed to maintain the accuracy of Company records and reports, comply with laws and regulations, conduct business in an honest and ethical manner, and properly report known violations of the Code of Conduct and law.

79.     Moreover, the Individual Defendants who served on the Company's Audit Committee during the Relevant Period violated the Audit Committee Charter by engaging in or permitting the Company to engage in issuing materially false and misleading statements to the investing public and facilitating and disguising the Individual Defendants' violations of law, including breaches of fiduciary duty, unjust enrichment, gross mismanagement, waste of corporate assets, abuse of control, and violations of the Exchange Act. In addition, the Individual Defendants who served on the Company's Audit Committee during the Relevant Period violated the Audit Committee Charter by failing to adequately oversee the integrity of the Company's financial disclosures, failing to adequately oversee the Company's compliance with legal and regulatory requirements, failing to adequately oversee the Company's risk assessments and risk management, failing to adequately discuss with management the Company's financial information prior to public distribution, and failing to adequately oversee the Company's disclosure controls and procedures.

# THE INDIVIDUAL DEFENDANTS' MISCONDUCT

### Background on DermTech

80.     DermTech is a Delaware corporation founded in 1995 that is based in San Diego, California. DermTech engages in the development and sale of products for the diagnosis and treatment of skin diseases. It markets and develops products that facilitate the diagnosis and management of various skin conditions, including skin cancer, inflammatory diseases, and aging-related conditions. Its products and services include its melanoma test, DMT, as well as smart sticker and a telemedicine option for the melanoma test.[2]

## False and Misleading Statements

### March 5, 2021 Form 10-K

81.     On March 5, 2021, the Company filed its annual report on Form 10-K (the "2020 10-K") with the SEC for the fiscal year ended December 31, 2020. The 2020 10-K was signed by Defendants Dobak, Sun, Collins, Picozza, Posard, and Rosenman.

82.     Attached to the 2020 10-K were certifications pursuant to Rule 13a-14(a) and 15d-14(a) under the Exchange Act and the Sarbanes-Oxley Act of 2002 ("SOX") signed by Defendants Dobak and Sun attesting to the accuracy of the financial statements contained therein, the disclosure of any material changes to the Company's internal controls, and the disclosure of any fraud committed by the Company, its officers, or its directors.

83.     The 2020 10-K provided an overview of DermTech's operations, stating the following about the Company's strategy for "[s]ecur[ing] broad reimbursement coverage for [its] assays," in relevant part:

> We have targeted regional and national payors to secure favorable coverage decisions for the reimbursement of our tests. The PLA has completed the

---

[2]https://money.cnn.com/quote/profile/profile.html?symb=DMTK#:~:text=DermTech%20Inc%20(NASDAQ%3ADMTK)&text=Its%20products%20and%20services%20include,headquartered%20in%20San%20Diego%2C%20CA.

necessary analytical validity, clinical validity, and clinical utility studies that payors require molecular tests to undertake. We have also published a United States health economic impact study on the PLA in JAMA Dermatology, which shows that the PLA significantly reduces the relative cost to assess a pigmented lesion.

* * *

In March 2019, MolDX, which performs technology assessments for genomic tests, issued a favorable Draft LCD for the PLA. In late October 2019, the AMA provided us with the PLA Code. Pricing of $760 for the PLA Code was released on December 24, 2019 as part of the CLFS for 2020. The Final LCD, first made available on December 26, 2019, expanded the coverage proposal in the Draft LCD from one test per date of service to two tests per date of service, and allows clinicians to order our PLA if they have sufficient skill and experience to decide whether a pigmented lesion should be biopsied or assessed by our PLA. Our PLA became eligible for Medicare reimbursement on February 10, 2020. Our local Medicare Administrative Contractor, Noridian, relies upon MolDX for technology assessments of genomicbased tests and has adopted the Final LCD issued by MolDX. Noridian has issued its own LCD announcing coverage of our PLA. Even though the effective date of Noridian's LCD is June 7, 2020, Noridian began reimbursing us for our PLA as of February 10, 2020.

In addition to our demonstrated clinical validity, clinical utility is the most important attribute of a test for establishing coverage policies with payors because it demonstrates how frequently physicians adhere to the recommendation of the test and the resulting improvement in clinical outcomes. In 2020, we completed and published our largest clinical utility study of the PLA based on real-world commercial usage. This most recent clinical utility study on 3,418 cases corroborates earlier utility studies and demonstrates that clinicians adhere to the recommendation of the PLA more than 98% of the time. Our test significantly reduces surgical procedures and improves the diagnostic pathway for pigmented lesion assessment. Lesions clinically suspicious for melanoma have negative PLA results in over 90% of cases, leading to an approximately 90% reduction in surgical biopsies in our 2020 study. In January of 2021, we published additional registry study data highlighting that PLA use enriches biopsied samples for melanoma almost 5-fold. We believe our body of clinical evidence and utility will lead to securing coverage policies from the major commercial payors over the next 24 to 36 months, although no assurances can be given that any reimbursement coverage approvals will be obtained.

Verified Shareholder Derivative Complaint

We have secured several contracts with major preferred provider networks, including Blue Shield of California, Blue Cross and Blue Shield of Texas, Blue Cross and Blue Shield of Illinois, Carefirst - BCBS of Maryland and Priority Healthcare of Michigan. We have submitted clinical and technology assessment packages to eviCore healthcare, LLC, which provides consultative services for payors. We are in direct discussion with several national commercial payors, including Aetna, Cigna Corporation, UnitedHealthcare, Humana and several independent Blue plans, all of which have the PLA currently under review.

***April 16, 2021 Proxy Statement***

84.   On April 16, 2021, the Company filed the 2021 Proxy Statement with the SEC. Defendants Dobak, Rosenman, Collins, Picozza, and Posard solicited the 2021 Proxy Statement filed pursuant to Section 14(a) of the Exchange Act, which contained material misstatements and omissions.

85.   The 2021 Proxy Statement called for Company shareholders, *inter alia,* to: (1) elect Defendants Dobak and Rosenman to the Board; and (2) ratify KPMG LLP as the Company's independent auditor for fiscal year 2021.

86.   Regarding the Company's Code of Conduct, the 2021 Proxy Statement stated, in relevant part:

We have adopted a code of conduct and ethics that applies to all of our employees, including our principal executive officer and principal financial and accounting officer. The text of the code of conduct and ethics is posted on our website at *www.dermtech.com* and will be made available to stockholders without charge, upon request, in writing to Investor Relations at DermTech, Inc., 11099 N. Torrey Pines Road, Suite 100, La Jolla, CA 92037. Disclosure regarding any amendments to, or waivers from, provisions of the code of conduct and ethics that apply to our directors and principal executive, financial and accounting officers will be included in a Current Report on Form 8-K within four business days following the date of the amendment or waiver, unless website posting or the issuance of a press release of such amendment or waiver is then permitted by the rules of the Nasdaq Capital Market.

87.   Regarding the "Role of the Board in Risk Oversight," the 2021 Proxy Statement provided the following:

One of the key functions of our Board is informed oversight of our risk management process. The Board does not have a standing risk management committee, but rather administers this oversight function directly through the Board as a whole, as well as through the various standing committees of our Board that address risks inherent in their respective areas of oversight. In particular, our Board is responsible for monitoring and assessing strategic risk exposure and our Audit Committee has the responsibility to consider and discuss the major financial risk exposures facing the Company and the steps management has taken to monitor and control these exposures, including guidelines and policies to govern the process by which risk assessment and management is undertaken. The Audit Committee also monitors compliance with legal and regulatory requirements. Our Nominating and Corporate Governance Committee monitors the effectiveness of our corporate governance practices, including whether such practices are successful in preventing illegal or improper liability-creating conduct. Our Compensation Committee assesses and monitors whether any of our compensation policies and programs has the potential to encourage excessive risk-taking.

88.    Defendants Dobak, Rosenman, Collins, Picozza, and Posard caused the 2021 Proxy Statement to be false and misleading by failing to disclose that: (1) DermTech experienced challenges with collections from commercial payors; (2) the challenges resulted in a lower average selling price for DermTech's DMT; (3) as a result of the foregoing, DermTech's revenue growth would be adversely impacted; and (4) the Company failed to maintain internal controls.

89.    The 2021 Proxy Statement was also false and misleading because, despite assertions to the contrary, the Company's Code of Conduct was not followed, as the Individual Defendants violated the Code of Conduct, including by allowing false and misleading statements to be issued to the investing public.

90.    As a result of Defendants Dobak, Rosenman, Collins, Picozza, and Posard causing the 2021 Proxy Statement to be false and misleading, Company shareholders voted, *inter alia*, to: (1) reelect Defendants Dobak and Rosenman to the Board, allowing them to continue to breach their fiduciary duties to the Company; and (2); ratify KPMG LLP as the Company's independent registered public accounting firm for the 2021 fiscal year.

*May 13, 2021 Press Release*

91.    On May 13, 2021, the Company issued a press release announcing the Company's financial results for the first quarter of 2021. The press release stated the following, in relevant part:

**First Quarter 2021 Highlights**

• Billable sample volume of approximately 9,400 for the first quarter of 2021, a 62% increase compared to approximately 5,800 recorded for the first quarter of 2020 and a 13% sequential increase over the fourth quarter of 2020.

• Assay revenue of $2.2 million for the first quarter of 2021, a 175% increase compared to the first quarter of 2020 and a 40% sequential increase over the fourth quarter of 2020.

• Total revenue of $2.5 million for the first quarter of 2021, a 62% increase compared to the first quarter of 2020 and a 19% sequential increase over the fourth quarter of 2020.

• Achieved first full quarter with positive assay gross margin of 10% compared to negative 46% for the same period of 2020.

\* \* \*

• Commercial payor contracts with Blue Shield of California, Blue Cross Blue Shield of Illinois and Blue Cross Blue Shield of Texas became effective, contributing to [ASP] improvement.

92.    The press release also contained a quote from Defendant Dobak, who stated the following about DermTech's first quarter performance:

Q1 was a very busy quarter for DermTech with . . . the addition of noninvasive genomic patch testing, like the PLA, to the NCCN guidelines, and the effectiveness of our new contracts with major Blues plans in California, Texas and Illinois, which fueled strong assay revenue growth even during the height of the pandemic . . . . Data from the Optum economic study further confirms the cost saving potential of our technology, and we are optimistic that it will

help in our efforts with commercial payors. Access to physician offices continues to be challenging but we are starting to see some improvements, and we believe the recent launch of our PLAplus will help drive adoption.

### August 4, 2021 Press Release

93.    On August 4, 2021, the Company issued a press release announcing the Company's financial results for the second quarter of 2021. The press release stated the following, in relevant part:

**Second Quarter 2021 Highlights**

• Billable sample volume of approximately 11,750 for the second quarter of 2021, a 267% increase compared to approximately 3,200 recorded for the second quarter of 2020 and a 25% sequential increase over the first quarter of 2021.

• Assay revenue of $2.9 million for the second quarter of 2021, a 349% increase compared to the second quarter of 2020 and a 33% sequential increase over the first quarter of 2021.

• Total revenue of $3.1 million for the second quarter of 2021, a 269% increase compared to the second quarter of 2020 and a 24% sequential increase over the first quarter of 2021.

• Achieved second consecutive full quarter with positive assay gross margin of 11% compared to negative 118% for the same period of 2020.

94.    The press release also contained a quote from Defendant Dobak, who stated the following about DermTech's second quarter performance:

DermTech continued to execute on its core business drivers during Q2 by delivering healthy sample volume and revenue growth as we began to emerge from the peak of the pandemic . . . . Our recent efforts to complete the sales force expansion planning, the start of our in-market beta testing of our telemedicine solution, DermTech ConnectTM, and the initiation of a couple of integrated primary network pilots, enables additional adoption of [DMT]

and lays the commercial foundation for future products and channel expansion.

***November 9, 2021 Press Release***

95.    On November 9, 2021, the Company issued a press release announcing the Company's financial results for the third quarter of 2021. The press release stated the following, in relevant part:

**Third Quarter 2021 Highlights**

• Billable sample volume of approximately 11,720 for the third quarter of 2021, a 75% increase compared to approximately 6,700 recorded for the third quarter of 2020 and flat sequentially compared to the second quarter of 2021.

• Assay revenue of $3.0 million for the third quarter of 2021, a 140% increase compared to the third quarter of 2020 and a 2% sequential increase over the second quarter of 2021.

• Total revenue of $3.0 million for the third quarter of 2021, a 122% increase compared to the third quarter of 2020 and a 3% sequential decrease compared to the second quarter of 2021.

96.    The press release also contained a quote from Defendant Dobak, who stated the following about DermTech's third quarter performance:

I'm proud of how we continued to execute against our growth drivers in the third quarter, despite a challenging macro-environment. We have built out our sales force, successfully completed a pilot with one primary care network and expanded a pilot with another . . . . With these building blocks in place, we feel well-positioned to continue moving forward with our initiatives and drive revenues as business environments improve.

***March 1, 2022 Press Release***

97.    On March 1, 2021, the Company issued a press release announcing the Company's financial results for the fourth quarter of 2021 and full year 2021. The press release stated the following, in relevant part:

**Fourth Quarter and Full Year 2021 Highlights**

• Billable sample volume of approximately 11,780 for the fourth quarter of 2021, a 42% increase compared to approximately 8,300 recorded for the

fourth quarter of 2020. Billable sample volume for the full year 2021 of approximately 44,620, an 86% increase compared to 2020.

• Assay revenue of $3.0 million for the fourth quarter of 2021, a 90% increase compared to the fourth quarter of 2020. Assay revenue for the full year of 2021 of $11.0 million, a 160% increase compared to 2020.

• Total revenue of $3.2 million for the fourth quarter of 2021, a 49% increase compared to the fourth quarter of 2020. Total revenue for the full year of 2021 of $11.8 million, a 101% increase compared to 2020.

98.     The press release also contained a quote from Defendant Dobak, who stated the following about DermTech's fourth quarter and full year 2021 performance:

> We are pleased with our fourth quarter and full year 2021 performance despite the various headwinds created by the pandemic. In 2021, we substantially scaled our commercial, operations, payor, and development teams. This will enable our ability to capture the promising market opportunities our Smart StickerTM genomics platform addresses . . . . We look forward to making significant progress in 2022, which will be our first year of commercialization with a fully resourced sales and marketing organization.

### March 10, 2022 Form 10-K

99.     On March 10, 2022, the Company filed its annual report on Form 10-K (the "2021 10-K") with the SEC for the fiscal year ended December 31, 2021. The 2021 10-K was signed by Defendants Dobak, Sun, Collins, Tellado, Keraudy, Picozza, Posard, and Rosenman.

100.   Attached to the 2021 10-K were SOX certifications signed by Defendants Dobak and Sun attesting to the accuracy of the financial statements contained therein, the disclosure of any material changes to the Company's internal controls, and the disclosure of any fraud committed by the Company, its officers, or its directors.

101.   The 2021 10-K provided an overview of DermTech's operations, stating substantively the same statements about the Company's strategy for "[s]ecur[ing] broad reimbursement coverage for [its] assays" as set forth in ¶ 83.

*April 14, 2022 Proxy Statement*

102.   On April 14, 2022, the Company filed the 2022 Proxy Statement with the SEC. Defendants Dobak, Rosenman, Collins, Picozza, Posard, Tellado, and Kerauday solicited the 2022 Proxy Statement filed pursuant to Section 14(a) of the Exchange Act, which contained material misstatements and omissions.

103.   The 2022 Proxy Statement called for Company shareholders, *inter alia,* to: (1) elect Defendants Collins and Posard to the Board; and (2) ratify KPMG LLP as the Company's independent auditor for fiscal year 2022; (3) approve, on an advisory basis, the compensation of the Company's named executive officers; (4) approve, on an advisory basis, the frequency of holding an advisory vote on the compensation of our named executive officers.

104.   Regarding the Company's Code of Conduct, the 2022 Proxy Statement stated, in relevant part:

> We have adopted a code of conduct and ethics that applies to all of our employees, including our principal executive officer and principal financial and accounting officer. The text of the code of conduct and ethics is posted on our website at *www.dermtech.com* and will be made available to stockholders without charge, upon request, in writing to Investor Relations at DermTech, Inc., 11099 N. Torrey Pines Road, Suite 100, La Jolla, CA 92037. Disclosure regarding any amendments to, or waivers from, provisions of the code of conduct and ethics that apply to our directors and principal executive, financial and accounting officers will be included in a Current Report on Form 8-K within four business days following the date of the amendment or waiver, unless website posting or the issuance of a press release of such amendment or waiver is then permitted by the rules of the Nasdaq Capital Market.

105.   Regarding the "Role of the Board in Risk Oversight," the 2022 Proxy Statement provided the following:

> One of the key functions of our Board is informed oversight of our risk management process. The Board does not have a standing risk management committee, but rather administers this oversight function directly through the Board as a whole, as well as through the various standing committees of our Board that address risks inherent in their respective areas of oversight. In

particular, our Board is responsible for monitoring and assessing strategic risk exposure and our Audit Committee has the responsibility to consider and discuss the major financial risk exposures facing the Company and the steps management has taken to monitor and control these exposures, including guidelines and policies to govern the process by which risk assessment and management is undertaken. The Audit Committee also monitors compliance with legal and regulatory requirements. Our Nominating and Corporate Governance Committee monitors the effectiveness of our corporate governance practices, including whether such practices are successful in preventing illegal or improper liability-creating conduct. Our Compensation Committee assesses and monitors whether any of our compensation policies and programs has the potential to encourage excessive risk-taking.

106.   Defendants Dobak, Rosenman, Collins, Picozza, Posard, Tellado, and Keraudy caused the 2022 Proxy Statement to be false and misleading by failing to disclose that: (1) DermTech experienced challenges with collections from commercial payors; (2) the challenges resulted in a lower average selling price for DermTech's DMT; (3) as a result of the foregoing, DermTech's revenue growth would be adversely impacted; and (4) the Company failed to maintain internal controls.

107.   The 2022 Proxy Statement was also false and misleading because, despite assertions to the contrary, the Company's Code of Conduct was not followed, as the Individual Defendants violated the Code of Conduct, including by allowing false and misleading statements to be issued to the investing public.

108.   As a result of Defendants Dobak, Rosenman, Collins, Picozza, Posard, Tellado, and Keraudy causing the 2022 Proxy Statement to be false and misleading, Company shareholders voted, *inter alia*, to: (1) reelect Defendants Collins and Posard to the Board, allowing them to continue to breach their fiduciary duties to the Company; (2) ratify KPMG LLP as the Company's independent registered public accounting firm for the 2022 fiscal year; (3) approve, on an advisory basis, the compensation of the Company's named executive officers; and (4) approve, on an advisory basis, the frequency of holding an advisory vote on the compensation of our named executive officers.

*May 3, 2022 10-Q and Press Release*

109.   On May 3, 2022, the Company filed its Form 10-Q with the SEC for the quarterly period ended March 31, 2022 (the "1Q22 10-Q") and issued an accompanying press release which stated, in relevant part:

**First-Quarter 2022 Financial Results**
- Billable sample volume grew 53 percent from the first quarter of 2021 to approximately 14,370.
- Assay revenue was $3.5 million, up 61 percent from the first quarter of 2021, primarily due to higher billable sample volume.
- Total revenue was $3.7 million, a 47 percent increase from the first quarter of 2021, driven by higher assay revenue.

*          *          *

**2022 Outlook Results**
The Company affirmed its full-year 2022 outlook for assay revenue between $22 million and $26 million.

**The Truth Begins to Emerge While False and Misleading Statements Continue**

*August 8, 2022 10-Q and Press Release*

110.   On August 8, 2022, the Company filed its 2Q22 10-Q with the SEC. After the market closed that day, the Company issued a press release regarding its financial results for the Company's second quarter. In relevant part, the press release stated that the Company expected "a lower average selling price (ASP) for [their] DMT [because of] … Medicare billing code edits [and] … less favorable collection patterns from commercial payors."

111.   Further, the press release stated, in relevant part, that:

**Second-Quarter 2022 Financial Results**
- Billable sample volume grew 56 percent from the second quarter of 2021 to approximately 18,320.
- Assay revenue was $4.1 million, up 43 percent from the second quarter of 2021, primarily due to higher billable sample volume.
- Total revenue was $4.2 million, a 36 percent increase from the second quarter of 2021, driven by higher assay revenue.

- Cost of assay revenue was $3.2 million, a 24 percent increase from the second quarter of 2021, yielding an assay gross margin of 22%, compared to 11% for the second quarter of 2021.

\*          \*          \*

**2022 Outlook**

The Company updated its full-year 2022 outlook for assay revenue and now expects between $16 million and $19 million.

112.   On this news, the Company's stock price fell $2.87 per share, or 34%, from a closing price of $8.43 per share on August 8, 2022 to close at $5.56 per share on August 9, 2022. Additionally, an unusually heavy volume of stocks was also traded – nearly four times the typical number of shares that had been trading.

113.   The statements referenced above in ¶¶ 81-83, 91-101, 109, and 111 were materially false and misleading, and failed to disclose material facts necessary to make the statements made not false and misleading. Specifically, the Individual Defendants willfully or recklessly made and/or caused the Company to make false and misleading statements that failed to disclose, *inter alia*, that: (1) DermTech experienced challenges with collections from commercial payors; (2) the challenges resulted in a lower average selling price for DermTech's DMT; (3) as a result of the foregoing, DermTech's revenue growth would be adversely impacted; and (4) the Company failed to maintain internal controls. As a result of the foregoing, Defendants' statements about the Company's business, operations, and prospects were materially false and misleading and/or lacked a reasonable basis at all relevant times.

## **THE TRUTH EMERGES**

### *November 3, 2022 10-Q and Press Release*

114.   On November 3, 2022, the Company filed its 3Q22 10-Q with the SEC. After the market closed, the Company also issued a press release regarding its third quarter financial results, wherein Defendant Dobak disclosed that the year-by-year billable sample volume's "sequential growth was flat due to headwinds caused by limited commercial payer coverage." Defendant Dobak attributed the disappointing growth to "commercial

payer collection challenges [having] affect[ed] estimating ASP [average selling price]" and revealed that the Company expected "at least $13 million in assay revenue for the full-year 2022," which was "below [its] previous guidance range."

115.   Specifically, the press release stated:

"We achieved meaningful year-over-year billable sample volume growth, but *sequential growth was flat due to headwinds caused by limited commercial payer coverage*," said John Dobak, M.D., CEO, DermTech. "Despite these challenges, we have more positive activity with payers now than we've ever had and are confident we're on the path to meaningfully growing covered lives in the U.S. We remain closely engaged with commercial payers and believe that we'll potentially add 30 to 40 million covered lives by the end of the first quarter of 2023. We've recently executed an agreement with a large regional payer and have received an excellent policy from a prominent laboratory benefits manager. We've also completed price negotiations with a national government payer that runs the largest integrated health care system in the U.S. We've spent productive time with national payer medical directors and have several scheduled comprehensive reviews with medical policy teams in the upcoming months, which we see as additional, important potential business catalysts."

Dr. Dobak continued, "We believe the value proposition of our DermTech Melanoma Test (DMT) continues to be embraced by our customers, but *growth in utilization with certain customers is tempered because of typical payor tactics to impede our adoption momentum. Due to these factors, we expect to finish 2022 below our previous guidance range. It's difficult to provide a revised forecast due to commercial payer collection challenges which affect estimating ASP and the potential for additional changes in estimates for anticipated cash collections, but we do expect to achieve at least $13 million in assay revenue for the full-year 2022."*[3]

*          *          *

**Third Quarter 2022 Financial Results**
- Billable sample volume grew 54 percent from the third quarter of 2021 to approximately 18,080.

---

[3] Emphasis added.

- Assay revenue was $3.4 million, up 16 percent from the third quarter of 2021, primarily due to higher billable sample volume.

- Total revenue was $3.6 million, an 18 percent increase from the third quarter of 2021, driven by higher assay revenue.

(Emphasis added.)

116.   On this news, the Company's stock price fell $1.34 per share, or 44.67%, from a closing price of $3.00 per share on November 3, 2022 to close at $1.66 per share on November 4, 2022, on unusually heavy trading volume.

## DAMAGES TO DERMTECH

117.   As a direct and proximate result of the Individual Defendants' conduct, DermTech has lost and expended, and will continue to lose and expend, many millions of dollars.

118.   Such expenditures include, but are not limited to, legal fees, costs, and any payments for resolution of or to satisfy a judgment associated with the Securities Class Action, and amounts paid to outside lawyers, accountants, and investigators in connection thereto.

119.   Such expenditures also include, but are not limited to, fees, costs, and any payments for resolution of or to satisfy judgments associated with any other lawsuits filed against the Company or the Individual Defendants based on the misconduct alleged herein, and amounts paid to outside lawyers, accountants, and investigators in connection thereto.

120.   Such expenditures will also include costs incurred in any internal investigations pertaining to violations of law, costs incurred in defending any investigations or legal actions taken against the Company due to its violations of law, and payments of any fines or settlement amounts associated with the Company's violations.

121.   As a direct and proximate result of the Individual Defendants' conduct, DermTech has also suffered and will continue to suffer a loss of reputation and goodwill, and a "liar's discount" that will plague the Company's stock in the future due to the Company's and their misrepresentations.

## DERIVATIVE ALLEGATIONS

122.   Plaintiff brings this action derivatively and for the benefit of DermTech to redress injuries suffered, and to be suffered, as a result of the Individual Defendants' breaches of their fiduciary duties as directors and/or officers of DermTech, unjust enrichment, abuse of control, gross mismanagement, waste of corporate assets, the aiding and abetting thereof, as well as for violations of the Exchange Act.

123.   DermTech is named solely as a nominal party in this action. This is not a collusive action to confer jurisdiction on this Court that it would not otherwise have.

124.   Plaintiff is, and has been at all relevant times, a shareholder of DermTech. Plaintiff will adequately and fairly represent the interests of DermTech in enforcing and prosecuting its rights, and, to that end, have retained competent counsel, experienced in derivative litigation, to enforce and prosecute this action.

## DEMAND FUTILITY ALLEGATIONS

125.   Plaintiff incorporates by reference and re-alleges each and every allegation stated above, as if fully set forth herein.

126.   A pre-suit demand on the Board of DermTech is futile and, therefore, excused. At the time of filing of this action, the Board consists of the following seven individuals: Defendants Capone, Collins, Keraudy, Malloy, Posard, and Rosenman (the "Director-Defendants"), along with non-party Bret Christensen (together with the Director Defendants, the "Directors"). Plaintiff needs only to allege demand futility as to four of seven Directors who are on the Board at the time this action is commenced.

127.   Demand is excused as to all of the Director-Defendants because each one of them faces, individually and collectively, a substantial likelihood of liability as a result of the scheme they engaged in knowingly or recklessly to make and/or cause the Company to make false and misleading statements and omissions of material facts. This renders the Director-Defendants unable to impartially investigate the charges and decide whether to pursue action against themselves and the other perpetrators of the scheme.

128.   In complete abdication of their fiduciary duties, the Director-Defendants either knowingly or recklessly caused or permitted DermTech to issue materially false and misleading statements. Specifically, the Director Defendants caused DermTech to issue false and misleading statements which were intended to make the Company appear more profitable and attractive to investors. Moreover, the Director-Defendants caused the Company to fail to maintain internal controls. As a result of the foregoing, the Director-Defendants breached their fiduciary duties, face a substantial likelihood of liability, are not disinterested or independent, and demand upon them is futile, and thus excused.

129.   Additional reasons that demand on Defendant Capone is futile follow. Defendant Capone has served as a Company director since July 18, 2022. He also serves as a member of the Audit Committee. Defendant Capone received and continues to receive handsome compensation for his role as a director, including $312,429 for the 2022 Fiscal Year. As a trusted Company director, he conducted little, if any, oversight of the Company's engagement in the scheme to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. For these reasons, Defendant Capone breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

130.   Additional reasons that demand on Defendant Collins is futile follow. Defendant Collins has served as a Company director since August 2019 and serves as Chair of the Nominating and Corporate Governance Committee, as a member of the Audit Committee, and as a member of the Compensation Committee. Defendant Collins received and continues to receive handsome compensation for her role as a director, including $240,177 for the 2022 Fiscal Year. Defendant Collins solicited the 2021 and 2022 Proxy Statements which contained material misrepresentations and omissions and contributed to her re-election to the Board, as alleged above, and signed the 2021 and 2022 10-Ks, which

also contained false and misleading statements. As a trusted Company director, she conducted little, if any, oversight of the Company's engagement in the scheme to make false and misleading statements, consciously disregarded her duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded her duties to protect corporate assets. For these reasons, Defendant Collins breached her fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon her is futile and, therefore, excused.

131.   Additional reasons that demand on Defendant Keraudy is futile follow. Defendant Keraudy has served as a Company director since October 2021 and serves as a member of the Nominating and Corporate Governance Committee. Defendant Keraudy received and continues to receive compensation for her role as a director, including $217,048 for the 2022 Fiscal Year. As a trusted Company director, she conducted little, if any, oversight of the Company's engagement in the scheme to make false and misleading statements, consciously disregarded her duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded her duties to protect corporate assets. For these reasons, Defendant Keraudy breached her fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon her is futile and, therefore, excused.

132.   Additional reasons that demand on Defendant Malloy is futile follow. Defendant Malloy has served as a Company director since July 18, 2022. He also serves as a member of the Compensation Committee. Defendant Malloy received and continues to receive compensation for his role as a director, including $312,005 for the 2022 Fiscal Year. As a trusted Company director, he conducted little, if any, oversight of the Company's engagement in the scheme to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. For these reasons, Defendant Malloy breached his fiduciary duties, faces a substantial likelihood of

liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

133.   Additional reasons that demand on Defendant Posard is futile follow. Defendant Posard has served as the Chairman of the Board and a Company director since August 2019. He also serves as Chair of the Compensation Committee and as a member of the Nominating and Corporate Governance Committee. Defendant Posard received and continues to receive compensation for his role as a director, including $272,177 for the 2022 Fiscal Year. Defendant Posard solicited the 2021 and 2022 Proxy Statements which contained material misrepresentations and omissions and contributed to his re-election to the Board, as alleged above, and signed the 2021 and 2022 10-Ks, which also contained false and misleading statements. As a trusted Company director, he conducted little, if any, oversight of the Company's engagement in the scheme to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. For these reasons, Defendant Posard breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

134.   Additional reasons that demand on Defendant Rosenman is futile follow. Defendant Rosenman has served as a Company director since August 2019 and also serves as Chair of the Audit Committee. Defendant Rosenman received and continues to receive compensation for his role as a director, including $239,854 for the 2022 Fiscal Year. Defendant Rosenman solicited the 2021 and 2022 Proxy Statements which contained material misrepresentations and omissions and contributed to his re-election to the Board, as alleged above, and signed the 2021 and 2022 10-Ks, which also contained false and misleading statements. As a trusted Company director, he conducted little, if any, oversight of the Company's engagement in the scheme to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement

in the scheme, and consciously disregarded his duties to protect corporate assets. For these reasons, Defendant Rosenman breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

135.   Additional reasons that demand on the Board is futile follow.

136.   Defendants Rosenman (as Chair), Capone, and Collins (the "Audit Committee Defendants") served on the Company's Audit Committee during the Relevant Period. As such, they were responsible for the effectiveness of the Company's internal controls, the truth and accuracy of the Company's financial statements, and the Company's compliance with applicable laws and regulations. The Audit Committee Defendants violated the Audit Committee Charter by engaging in or permitting the dissemination of materially false and misleading statements to the public and by facilitating the Individual Defendants' violations of law, including breaches of fiduciary duty, unjust enrichment, waste of corporate assets, abuse of control, mismanagement, and violations of the Exchange Act. In addition, the Audit Committee Defendants violated the Audit Committee Charter by failing to adequately oversee the integrity of the Company's financial disclosures, failing to adequately oversee the Company's compliance with legal and regulatory requirements, failing to adequately oversee the Company's risk assessments and risk management, failing to adequately discuss with management the Company's information prior to public distribution, and failing to adequately oversee the Company's disclosure controls and procedures. Thus, the Audit Committee Defendants breached their fiduciary duties, are not disinterested, and demand is excused as to them.

137.   In violation of the Code of Conduct, the Director-Defendants engaged in or permitted the scheme to cause the Company to issue materially false and misleading statements to the investing public, and to facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, unjust enrichment, waste of corporate assets, abuse of control, gross mismanagement, and violations of the Exchange

Act. In addition, the Individual Defendants violated the Code of Conduct by failing to act with integrity, supporting and profiting from unethical behavior, failing to avoid conflicts of interest, failing to ensure the Company's disclosures were accurate, failing to ensure the Company complied with applicable laws, rules, and regulations, and failing to promptly report known violations of the Code of Conduct and the law. Thus, the Director-Defendants breached the Company's own Code of Conduct, are not disinterested, and demand is excused as to them.

138.   DermTech has been and will continue to be exposed to significant losses due to the wrongdoing complained of herein, yet the Directors have not filed any lawsuits against themselves or others who were responsible for that wrongful conduct to attempt to recover for DermTech any part of the damages DermTech suffered and will continue to suffer thereby. Thus, any demand upon the Directors would be futile.

139.   The Individual Defendants' conduct described herein and summarized above could not have been the product of legitimate business judgment as it was based on bad faith and intentional, reckless, or disloyal misconduct. Thus, none of the Director Defendants can claim exculpation from their violations of duty pursuant to the Company's charter (to the extent such a provision exists). As a majority of the Director-Defendants face a substantial likelihood of liability, they are self-interested in the transactions challenged herein and cannot be presumed to be capable of exercising independent and disinterested judgment about whether to pursue this action on behalf of the shareholders of the Company. Accordingly, demand is excused as being futile.

140.   The acts complained of herein constitute violations of fiduciary duties owed by DermTech's officers and directors, and these acts are incapable of ratification.

141.   The Director-Defendants may also be protected against personal liability for their acts of mismanagement and breaches of fiduciary duty alleged herein by directors' and officers' liability insurance if they caused the Company to purchase it for their protection with corporate funds, i.e., monies belonging to the stockholders of DermTech.

If there is a directors' and officers' liability insurance policy covering the Director Defendants, it may contain provisions that eliminate coverage for any action brought directly by the Company against the Director-Defendants, known as, *inter alia*, the "insured-versus-insured exclusion." As a result, if the Director-Defendants were to sue themselves or certain of the officers of DermTech, there would be no directors' and officers' insurance protection. Accordingly, the Director-Defendants cannot be expected to bring such a suit. On the other hand, if the suit is brought derivatively, as this action is brought, such insurance coverage, if such an insurance policy exists, will provide a basis for the Company to effectuate a recovery. Thus, demand on the Director-Defendants is futile and, therefore, excused.

142. If there is no directors' and officers' liability insurance, then the Director-Defendants will not cause DermTech to sue the Individual Defendants named herein, because, if they did, they would face a large uninsured individual liability. Accordingly, demand is futile in that event, as well.

143. Thus, for all of the reasons set forth above, all of the Director-Defendants, and, if not all of them, at least four of the seven Directors cannot consider a demand with disinterestedness and independence. Consequently, a demand upon the Board is excused as futile.

## **FIRST CLAIM**
### **Against the Individual Defendants for Violations of Section 14(a) of the Securities Exchange Act of 1934**

144. Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

145. Section 14(a) of the Exchange Act, 15 U.S.C. § 78n(a)(1), provides that "[i]t shall be unlawful for any person, by use of the mails or by any means or instrumentality of interstate commerce or of any facility of a national securities exchange or otherwise, in contravention of such rules and regulations as the [SEC] may prescribe as necessary or appropriate in the public interest or for the protection of investors, to solicit or to permit

the use of his name to solicit any proxy or consent or authorization in respect of any security (other than an exempted security) registered pursuant to section 12 of this title [15 U.S.C. § 78l]."

146.   Rule 14a-9, promulgated pursuant to § 14(a) of the Exchange Act, provides that no proxy statement shall contain "any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading." 17 C.F.R. § 240.14a-9.

147.   Under the direction and watch of the Individual Defendants, the 2021 and 2022 Proxy Statements failed to disclose that: (1) DermTech experienced challenges with collections from commercial payors; (2) the challenges resulted in a lower average selling price for DermTech's DMT; (3) as a result of the foregoing, DermTech's revenue growth would be adversely impacted; (4) the Company failed to maintain internal controls; and (5) due to the foregoing, Director-Defendants' statements regarding the Company's business, operations, and prospects were materially false, misleading, and/or lacked a reasonable basis at all relevant times.

148.   Under the direction and watch of the Individual Defendants, the 2021 and 2022 Proxy Statements also failed to disclose, *inter alia*, that: (1) although the Company claimed its officers and directors adhered to the Code of Conduct, the Individual Defendants violated these policies either without waivers or without such waivers being disclosed; and (2) contrary to the 2021 and 2022 Proxy Statements' descriptions of the Board's and its committees' risk oversight functions, the Board and its committees were not adequately exercising these functions and were causing or permitting the Company to issue false and misleading statements.

149.   In the exercise of reasonable care, the Individual Defendants should have known that by misrepresenting or failing to disclose the foregoing material facts, the statements contained in the 2021 and 2022 Proxy Statements were materially false and

misleading. The misrepresentations and omissions were material to Plaintiff in voting on the matters set forth for shareholder determination in the 2021 and 2022 Proxy Statements, including the election of directors, advisory approval of executive compensation, and ratification of the appointment of an independent registered public accounting firm.

150.   As a result of the material misstatements and omissions contained in the 2021 and 2022 Proxy Statements, Company shareholders voted to re-elect Defendants Dobak, Collins, Posard, and Rosenman to the Board, thus allowing them to continue breaching their fiduciary duties to DermTech.

151.   The Company was damaged as a result of the Individual Defendants' material misrepresentations and omissions in the 2021 and 2022 Proxy Statements.

152.   Plaintiff, on behalf of DermTech, has no adequate remedy at law.

## SECOND CLAIM

### Against Individual Defendants for Breach of Fiduciary Duties

153.   Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

154.   Each Individual Defendant owed to the Company the duty to exercise candor, good faith, and loyalty in the management and administration of DermTech's business and affairs.

155.   Each of the Individual Defendants violated and breached his or her fiduciary duties of candor, good faith, loyalty, reasonable inquiry, oversight, and supervision.

156.   The Individual Defendants' conduct set forth herein was due to their intentional or reckless breach of the fiduciary duties they owed to the Company, as alleged herein. The Individual Defendants intentionally or recklessly breached or disregarded their fiduciary duties to protect the rights and interests of DermTech.

157.   Moreover, the Individual Defendants breached their fiduciary duties owed to DermTech by personally making and/or causing the Company to make the investing public a series of materially false and misleading statements about DermTech's business,

operations, and prospects. Specifically, the Individual Defendants willfully or recklessly made and/or caused the Company to make false and misleading statements to the investing public that failed to disclose, *inter alia*, that: (1) DermTech experienced challenges with collections from commercial payors; (2) the challenges resulted in a lower average selling price for DermTech's DMT; (3) as a result of the foregoing, DermTech's revenue growth would be adversely impacted; and (4) the Company failed to maintain internal controls. As a result of the foregoing, Defendants' statements about the Company's business, operations, and prospects were materially false and misleading and/or lacked a reasonable basis at all relevant times.

158.   The Individual Defendants failed to correct and/or caused the Company to fail to correct the false and misleading statements and omissions of material fact, thus rendering them personally liable to the Company for breaching their fiduciary duties.

159.   Also in breach of their fiduciary duties, the Individual Defendants caused the Company to fail to maintain an adequate system of oversight, disclosure controls and procedures, and internal controls.

160.   The Individual Defendants had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the truth, in that they failed to ascertain and to disclose such facts, even though such facts were available to them.

161.   The Individual Defendants had actual or constructive knowledge that they had caused the Company to improperly engage in the fraudulent scheme set forth herein and to fail to maintain adequate internal controls. The Individual Defendants had actual knowledge that the Company was engaging in the fraudulent scheme set forth herein and that internal controls were not adequately maintained, or acted with reckless disregard for the truth, in that they caused the Company to improperly engage in the fraudulent scheme and to fail to maintain adequate internal controls, even though such facts were available to them. Such improper conduct was committed knowingly or recklessly and for the purpose

and effect of artificially inflating the price of the Company's securities. The Individual Defendants, in good faith, should have taken appropriate action to correct the scheme alleged herein and to prevent it from continuing to occur.

162.   These actions were not a good-faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

163.   As a direct and proximate result of the Individual Defendants' breaches of their fiduciary obligations, DermTech has sustained and continues to sustain significant damages. As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

164.   Plaintiff, on behalf of DermTech, has no adequate remedy at law.

## THIRD CLAIM

### Against Individual Defendants for Unjust Enrichment

165.   Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

166.   By their wrongful acts, violations of law, and false and misleading statements and omissions of material fact that they made and/or caused to be made, the Individual Defendants were unjustly enriched at the expense of, and to the detriment of, DermTech.

167.   The Individual Defendants either benefitted financially from the improper conduct, or received bonuses, stock options, or similar compensation from DermTech that was tied to the performance or artificially inflated valuation of DermTech, or received compensation or other payments that were unjust in light of the Individual Defendants' bad faith conduct.

168.   Plaintiff, as a shareholder and representative of DermTech, seeks restitution from the Individual Defendants and seeks an order from this Court disgorging all profits, including from insider transactions, benefits, and other compensation, including any performance-based or valuation-based compensation—obtained by the Individual Defendants due to their wrongful conduct and breaches of their fiduciary duties.

169.   Plaintiff, on behalf of DermTech, has no adequate remedy at law.

## FOURTH CLAIM

### Against Individual Defendants for Waste of Corporate Assets

170.   Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

171.   As a further result of the foregoing, the Company will incur many millions of dollars of legal liability and/or costs to defend unlawful actions (as evidenced, for example, by the Securities Class Action), to engage in internal investigations, and to lose financing from investors and business from future customers who no longer trust the Company and its products.

172.   As a result of the waste of corporate assets, the Individual Defendants are each liable to the Company.

173.   Plaintiff, on behalf of DermTech, has no adequate remedy at law.

## FIFTH CLAIM

### Against Individual Defendants for Abuse of Control

174.   Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

175.   The Individual Defendants' misconduct alleged herein constituted an abuse of their ability to control and influence DermTech, for which they are legally responsible.

176.   As a direct and proximate result of the Individual Defendants' abuse of control, DermTech has sustained significant damages. As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

177.   Plaintiff, on behalf of DermTech, has no adequate remedy at law.

## SIXTH CLAIM

### Against Individual Defendants for Gross Mismanagement

178.   Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

179.   By their actions alleged herein, the Individual Defendants, either directly or through aiding and abetting, abandoned and abdicated their responsibilities and fiduciary duties with regard to prudently managing the assets and business of DermTech in a manner consistent with the operations of a publicly held corporation.

180.   As a direct and proximate result of the Individual Defendants' gross mismanagement and breaches of duty alleged herein, DermTech has sustained and will continue to sustain significant damages.

181.   As a result of the misconduct and breaches of duty alleged herein, the Individual Defendants are liable to the Company.

182.   Plaintiff, on behalf of DermTech, has no adequate remedy at law.

## SEVENTH CLAIM

### Against Defendants Dobak and Sun for Contribution Under Sections 10(b) and 21D of the Exchange Act

183.   Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

184.   DermTech and Defendants Dobak and Sun are named as defendants in the Securities Class Action, which asserts claims under the federal securities laws for violations of Sections 10(b) and 20(a) of the Exchange Act, and SEC Rule 10b-5 promulgated thereunder. If and when the Company is found liable in the Securities Class Action for these violations of the federal securities laws, the Company's liability will be in whole or in part due to Defendants Dobak's and Sun's willful and/or reckless violations of their obligations as officers and/or directors of DermTech.

185.   Defendants Dobak and Sun, because of their positions of control and authority as officers and/or directors of DermTech, were able to and did, directly and/or indirectly, exercise control over the business and corporate affairs of DermTech, including the wrongful acts complained of herein and in the Securities Class Action.

186.   Accordingly, Defendants Dobak and Sun are liable under 15 U.S.C. § 78j(b), which creates a private right of action for contribution, and Section 21D of the Exchange

Act, 15 U.S.C. § 78u-4(f), which governs the application of a private right of action for contribution arising out of violations of the Exchange Act.

187.   As such, DermTech is entitled to receive all appropriate contribution or indemnification from Defendants Dobak and Sun.

**PRAYER FOR RELIEF**

FOR THESE REASONS, Plaintiff demands judgment in the Company's favor against all Individual Defendants as follows:

(a)   Declaring that Plaintiff may maintain this action on behalf of DermTech, and that Plaintiff is an adequate representative of the Company;

(b)   Declaring that the Individual Defendants have breached or aided and abetted the breach of their fiduciary duties to DermTech;

(c)   Determining and awarding to DermTech the damages sustained by it as a result of the violations set forth above from each of the Individual Defendants, jointly and severally, together with pre-judgment and post-judgment interest thereon;

(d)   Directing DermTech and the Individual Defendants to take all necessary actions to reform and improve its corporate governance and internal procedures to comply with applicable laws and to protect DermTech and its shareholders from a repeat of the damaging events described herein, including, but not limited to, putting forward for shareholder vote the following resolutions for amendments to the Company's Bylaws or Certificate of Incorporation and the following actions as may be necessary to ensure proper corporate governance policies:

1. a proposal to strengthen the Board's supervision of operations and develop and implement procedures for greater shareholder input into the policies and guidelines of the board;

2. a provision to permit the shareholders of DermTech to nominate at least four candidates for election to the Board; and

3. a proposal to ensure the establishment of effective oversight of

compliance with applicable laws, rules, and regulations.

       (e)    Awarding DermTech restitution from Individual Defendants, and each of them;

       (f)    Awarding Plaintiff the costs and disbursements of this action, including reasonable attorneys' and experts' fees, costs, and expenses; and

       (g)    Granting such other and further relief as the Court may deem just and proper.

## JURY TRIAL DEMANDED

Plaintiff hereby demands a trial by jury.

Dated: December 15, 2023          Respectfully submitted,

**THE BROWN LAW FIRM, P.C.**

*/s/ Robert C. Moest*
Robert C. Moest, Of Counsel, SBN 62166
2530 Wilshire Boulevard, Second Floor
Santa Monica, California 90403
Telephone: (310) 915-6628
Facsimile: (310) 915-9897
Email: RMoest@aol.com

**THE BROWN LAW FIRM, P.C.**
Timothy Brown
767 Third Avenue, Suite 2501
New York, NY 10017
Telephone: (516) 922-5427
Facsimile: (516) 344-6204
Email: tbrown@thebrownlawfirm.net

**BRONSTEIN, GEWIRTZ & GROSSMAN, LLC**
Peretz Bronstein
Eitan Kimelman
60 East 42nd Street, Suite 4600
New York, NY 10165

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Telephone: (212) 697-6484
Facsimile: (212) 697-7296
Email: peretz@bgandg.com
                           eitank@bgandg.com

*Counsel for Plaintiff*

Verified Shareholder Derivative Complaint

## **VERIFICATION**

I, Joseph Fleischman, am a plaintiff in the within action.  I have reviewed the allegations made in this Shareholder Derivative Complaint, know the contents thereof, and authorize its filing. To those allegations of which I have personal knowledge, I believe those allegations to be true. As to those allegations of which I do not have personal knowledge, I rely upon my counsel and their investigation and believe them to be true.

I declare under penalty of perjury that the foregoing is true and correct.  Executed this 12 _____ day of December, 2023.

DocuSigned by:

_Joseph A. Fleischman_

7C7BE76E521F459...

Joseph Fleischman